CHARLES WILKINS, et al., v. GEORGE W. TOURTELLOTT, et al.

1. DEED, CONSTRUED; *Obvious Intent of Parties; Sufficient Description.* Where, in a controversy concerning a tract of land, the description in a certain deed is challenged as insufficient, and in such description the initial point is stated to be the southwest corner of a tract of land (which tract is sufficiently and fully identified), said southwest corner being the northwest corner of a certain other tract (which other tract is also sufficiently and fully identified), and there is doubt as to which corners of the two tracts are technically and correctly the southwest and the northwest corners respectively, but there is only one point which by any pretense will answer to both corners or can be supposed to have been intended by any such description, and where only by starting at such point will the description reach the land in question or cover land owned by the grantor or to which he had any color or claim of title, and where within three weeks after such deed the grantor makes a plat of his lands in which he writes the name of the grantee as owner upon the tract in question, and where it does not appear that the grantor ever made any subsequent claim to the tract, *held*, that the deed will be construed according to the obvious intent of the parties, and as containing a sufficient description.

2. AFFIDAVIT *Under § 191 of Code, Must Show What.* An affidavit for an order of attachment is required by § 191 of the code to show that the plaintiff's claim is just. It is sufficient in such an affidavit to simply allege that it is just. It is also sufficient if, without such direct state-

ment, the facts concerning the plaintiff's claim, as disclosed in the affidavit, show that it is just.

3. AFFIDAVIT *Showing Plaintiff's Claim is Just.* When the affidavit alleges that the plaintiff's claim is "for the amount of money that he was compelled to pay for and on account of a judgment on a bond or writing obligatory, wherein the said defendant was principal and the plaintiff was security, and which said plaintiff did pay for the benefit of said defendant, that the sum so paid, and for which the defendant is indebted to him, amounts," etc., *held,* that such affidavit shows that the plaintiff's claim is just.

4. ATTACHMENT; *Defective Return of Order; Collateral Proceeding.* The return of an officer upon an order of attachment must be authenticated by his signature, and when an order of attachment is filed in the clerk's office, accompanied only by a paper stating the fact that service had been made, but failing to show by whom it had been made, which paper is authenticated by no signature, *held,* that the record fails to disclose a valid attachment, and the defect is one which can be taken advantage of in a collateral proceeding.

5. DEFECTIVE RETURN, *Curable.* While the omission of the signature to a return renders it incomplete and defective, yet the defect is one which can be cured by amendment, and the officer may be permitted thereafter to attach his signature to the return.

6. RETURN; *Amendable Defect.* The return of an officer on an order of attachment, which attachment is levied upon real estate, should show that the officer left with the occupant, or if there were no occupant, in a conspicuous place on the real estate, a copy of the order. But an omission so to state in the return is like the lack of an official signature — an amendable defect.

7. REAL ESTATE OF BANKRUPT, *Sale of; Title of Purchaser.* When the assignee of a bankrupt schedules certain real estate as the property of the bankrupt's estate, files a petition in the bankrupt court for a sale of such real estate (describing it), obtains from such court an order for its sale, sells it, reports its sale, obtains an order of confirmation of such sale, and conveys it, *held,* that such proceedings do not operate as an adjudication that the real estate was the property of the bankrupt at the time of the filing of the petition in bankruptcy, and therefore subject to sale in the bankrupt court, but only that, whatever of title, legal or equitable, which the bankrupt had at that time, and which passed to the assignee by the bankruptcy proceedings, has been legally transferred to the purchaser.

8. TITLE, *No Warranty of.* A sale by an assignee in bankruptcy, like a sale by a sheriff or other ministerial officer, although confirmed by the court, carries no warranty of title.

9. REAL ESTATE, *Never a Part of Estate in Bankruptcy, May be Shown, When.* Where, after a bankrupt's discharge, a party holding a claim

Wilkins v. Tourtellott.

against his estate files his bill in equity to set aside such discharge, on the ground that the bankrupt fraudulently omitted to disclose certain property owned by him, and alleges that at the time of filing his petition in bankruptcy the bankrupt was the owner of a certain tract of land (describing it), and upon the hearing the bill is sustained, the discharge canceled and set aside, and the assignee ordered to schedule and sell the bankrupt's property, and where thereafter the assignee schedules and sells, not merely the tract described in the bill of equity, but also certain other real estate, *held*, that the complainant in the bill of equity is not estopped by the proceedings from showing that this other real estate was not the property of the bankrupt at the time of the filing of the petition in bankruptcy, and never became a part of the estate in bankruptcy.

10. ———— *Burden of Proof.* Where an assignee in bankruptcy schedules and sells real estate, the title to which was acquired by the bankrupt after the filing of the petition in bankruptcy, the burden is on the assignee and those claiming under him to show that such real estate equitably and in fact belonged to the bankrupt at the time of filing the petition, and so became a part of the estate in bankruptcy.

11. Title, *How Controlled by the Record, and Treated by Courts. Prima facie,* the record controls the matter of title, and parties may ordinarily rely upon that as sufficient protection. And where the immediate parties to conveyances in the record chain of title are both dead, courts will not lightly, upon purely outside testimony, ignore the evidence of their contracts and dealing, furnished by the writings which they have executed.

12. Deed, *Destitute of Description and Name of Grantee; Authority to Insert; Grantor May Ratify.* While a deed should be complete as to description and name of grantee at the time of delivery, in order to transfer title, yet where a deed destitute of description and name of grantee, but signed and acknowledged by the grantor and otherwise complete, is delivered to a party with parol authority to fill in the description and the name of the grantee, and such party thereafter, in pursuance of such authority, in the absence of the grantor fills in the description and the name of the grantee, and records the deed thus apparently perfect, the grantor may ratify his action and so in effect make a redelivery of the deed after it has become perfect and complete.

13. Bankrupt's Contracts; *Power of Assignee.* After a bankrupt's estate has been transferred to the assignee in bankruptcy, the bankrupt may make no further contracts in reference to it, and if he attempts to make any such contracts the assignee may accept or repudiate his action.

14. Bankrupt's Action, *Ratified by Assignee.* Where a title bond to an undivided ten acres belonging to a bankrupt at the time of filing his petition in bankruptcy, and so passed to the assignee as a part of

his estate in bankruptcy, and thereafter the bankrupt, without the knowledge of the assignee, by an arrangement with the obligor in the title bond, located it and took a conveyance to himself of a definite tract, and then the assignee on receiving information of what had been done, scheduled and sold this definite tract as a part of the bankrupt's estate, *held*, that thereby he ratified and confirmed the action of the bankrupt in the matter.

15. Two CONFLICTING CHAINS OF TITLE, *How Treated by Courts.*  Where there are two conflicting chains of title, and the owners of one, the parties who have invested their money in its purchase, become finally satisfied that such title is worthless, and practically give up all claim to it, but nevertheless execute a quitclaim deed to a mere speculator, upon the sole consideration of his making good to them a loss occasioned by his omission of official duty, the courts are justified in resolving doubtful questions of fact in respect to the title in favor of the holders of the opposing chain.

16. TAX DEED; *Insufficient Description.*  The description in a tax deed must be such that with ordinary and reasonable certainty it can be determined exactly what land has been sold.  Where the description was five acres out of a given and described tract of thirty-eight acres, said five acres assessed in name of and as belonging to S., excepting two acres off the easterly end, fronting on the Missouri river, and redeemed February 8, 1873, by R.; and where the assessment roll shows no part of or interest in the thirty-eight-acre tract assessed to S., and where in fact S. had, at the time of making out the assessment roll, no location of his undivided interest in said tract, and where thereafter the only attempted location of such undivided interest was by two separate conveyances, one of a six-acre and the other of a four-acre tract, and at no time did he appear to be the owner of any separate tract of five acres, *held*, that the description in the deed was insufficient to cover any land.

17. TAX DEED, *Failing to Transfer Title.*  Although the description in a tax deed be sufficient, yet if the tax-sale book, the notice of sale, and the sale certificate, omit a vital portion of such description, and the deed is challenged before the running of the statute of limitations, the deed will fail as a transfer of title.

### *Error from Wyandotte District Court.*

EJECTMENT, brought by *George W. Tourtellott* and *George P. Alcott*, against *Charles Wilkins* and five others, to recover the possession of a certain tract of land in Kansas City, Kansas.  The opinion contains a sufficient statement of the facts.  December 29, 1881, it was adjudged that the plaintiffs recover of the defendants the land described in their

amended petition, and have judgment against defendants for costs. The defendants bring the case here.

*James M. Mason,* for plaintiffs in error.

*Pratt, Brumback & Ferrey,* for defendants in error.

The opinion of the court was delivered by

BREWER, J.: This was an action of ejectment, brought in the district court of Wyandotte county, to recover the possession of a tract of land in Kansas City, Kansas. The case was tried by the court without a jury, and judgment rendered in favor of the defendants in error for the possession. The defendants, as plaintiffs in error, bring the record here for reveiw. The record is very voluminous, comprising 714 pages. The facts are numerous and complicated, and the questions of law intricate and difficult. The petition in error contains 89 separate allegations in error, and in support of these allegations counsel have filed a careful and elaborate brief. Perhaps a general history of the title to the tract in controversy, and a statement of the claims of the respective parties, may help to a clearer understanding of the merits of the case, and the separate questions as they are severally considered.

In 1860, David E. James was the owner of an undivided three-eighths interest in a portion of what is known as "Armstrong's Reserve, No. 1." In that year he executed a title bond for ten acres, which bond became the property of Joseph E. Snyder. Thereafter, in 1864, he executed and delivered to said Snyder a *carte-blanche* deed — a deed in which the name of the grantee and description of the property were omitted, and authorized Snyder to fill it up at such time as he might desire, with six acres on the bank of the Missouri river, somewhere between the state line and the mouth of the Kansas river. In 1867, in the district court of Wyandotte county, a partition was made of said portion of Armstrong's Reserve, No. 1, and a tract of forty-three and one-half acres allotted to James. In 1868, Snyder filled up this *carte-*

*blanche* deed with his own name as grantee, and with a description by metes and bounds of six acres on the banks of the Missouri river, and filed the deed, thus apparently perfect and complete, for record in the office of the register of deeds of Wyandotte county. In April, 1869, he conveyed this property back to James, and James conveyed to him a tract of four acres. Two acres were embraced within the description in each of these three deeds, but a part of the four-acre tract, the southwesterly half of it, was not embraced within the six-acre tract. The land in controversy is in this portion of the four-acre tract. In 1874, one Lafayette Traber commenced two actions of attachment in the district court of Wyandotte county, and in such actions seized and sold this property, purchasing it himself at the sheriff's sale, and thereafter sold it to plaintiffs. This, then, is plaintiffs' chain of title: a deed from James to Snyder; a sheriff's deed from Snyder to Traber, and a deed from Traber to plaintiffs. On the other hand, these facts appear: On December 2, 1867, Snyder filed his voluntary petition in bankruptcy in the western district of Missouri, setting up under oath in his original schedule therein filed, that he had no property except his tools and trade and certain exempt property. The title bond though belonging to him was not standing in his name, and the *cart-blanche* deed had not then been filled out or recorded, so that there was nothing of record to show his interest in this land. On September 25, 1868, he obtained his discharge in bankruptcy. In 1870, one Joseph L. Norman purchased an outstanding claim against J. E. Snyder, and filed his bill in equity in the district court of the United States against Snyder, alleging that Snyder was the owner of the six-acre tract, and had obtained his discharge of bankruptcy through perjury and fraud, and praying to have such discharge set aside and canceled. Upon a hearing, this bill in equity was sustained and the discharge set aside, and the assignee in bankruptcy ordered to schedule the property of the bankrupt and proceed according to law. The assignee filed the schedule, embracing within it not merely the land covered

by the six-acre conveyance, but also that within the four-acre deed, and thereafter upon petition he was ordered to sell the bankrupt's real estate, and did sell and convey both tracts to Byron Judd. The latter conveyed to Cobb and Bartlett, who conveyed to N. McAlpine, one of the defendants. Besides this, defendants held two tax deeds, and also a quitclaim deed from the heirs of David E. James. This was their title.

With this general statement, we proceed to examine the particular questions involved, and of these there are four which are controlling. As they are decided, so goes the case.

First, is the description of the last deed from James to Snyder, the deed which purports to convey four acres, a good and sufficient description, and such as embraces the land in controversy? Second, were the proceedings in the attachment cases regular? and if not, are the defects therein such as to vitiate the attempted transfer of title to Traber? Third, did the proceedings in bankruptcy operate to transfer to Judd any title to this land? Fourth, were the tax deeds valid to pass title? Of these in their order.

I. And first as to the description. That is as follows:

"All that tract or parcel of land situated in the county of Wyandotte, and state of Kansas, and described as follows, to wit: (Var. 11° E.) Beginning at the southwest corner of a tract of land conveyed by said James to one James F. Joy, and now known as railroad land, said southwest corner being the northwest corner of a certain parcel of land now owned by said James, thence running south sixty-one degrees, fifty minutes (61° 50'), west five hundred and eighty and eight-tenths (580.8) feet; thence south 28° 10' (300 feet); thence north 61° 50', east five hundred and eighty and eight-tenths (580.8) feet; thence north 28° 10' west, (300 feet), to the place of beginning, and all to contain four (4) acres; said land being township (11) eleven, range (25) twenty-five, in the above-mentioned county and state."

It is difficult without the aid of a diagram to make clear the full nature and force of the objection to this description. It hinges on the initial point. That is the southwest corner of a tract of land known as railroad land. It is claimed

that, to make the description cover this land, the initial point should be the northwest corner of said land. The railroad land was a tract of about ten acres, running lengthwise along the bank of the Missouri river in a northwesterly and southeasterly direction. Its length was a good deal more than double its width. It was the entire northeasterly end of the tract set off to James in the partition suit above referred to. Its boundaries, except along the river bank, are straight lines. Its southwesterly boundary-line ran at an angle of only 28° 12′ from a north-and-south line. Now if the initial point is at the most southerly corner of this tract, the description would not embrace the land in question; but if it is at the most westerly corner, it will. One surveyor looking at the plat testified that the most westerly corner was the southwest corner, while four testified that the most southerly was. Evidently there is some uncertainty as to which is properly called the southwest corner. We are inclined to think that, as the tract lies, the most southerly corner is more properly called the southwest corner. But the very doubt which attends this fact, coupled with other portions of the description and other facts in the case, compel us to sustain the sufficiency of the description as embracing the land in question. First, it must be presumed that the grantor intended to convey the land he owned, rather than that he attempted to convey land to which he had no pretense of title; second, the initial point is not merely the southwest corner of the railroad land, but also "the northwest corner of a certain parcel of land now owned by said James." That is, it is a point which is at the same time the southwest corner of one tract and the northwest corner of another. Now while something of the same question may be raised as to what is properly the northwest corner of the James land, there is no other point which has any pretense of answering both descriptions. Further than that, twenty-one days after executing this conveyance, David E. James and others signed and acknowledged the plat of Kansas City, Kas., and on such plat this land was marked as the property

of Snyder. Placing all these things together, it seems to us that there can be no reasonable question as to the sufficiency of this description. (*Schmitz v. Schmitz*, 19 Wis. 207; *Peck v. Mallams*, 10 N. Y. 532; *Hathaway v. Power*, 6 Hill, 453; 1 Greenl. Ev., § 301, note 2; *Waterman v. Johnson*, 13 Pick. 267; *Stone v. Clark*, 1 Metc. 378; *Craft v. Hibbard*, 4 Metc. 438.)

II. As to the attachment proceedings, there are three principal defects alleged. As the defendant was a non-resident, and served only by publication, the validity of the judgments must depend primarily on the sufficiency of these attachment proceedings. The property was sold under executions issued upon both judgments, so that if either judgment is valid the sale must be sustained, and the title conveyed is good. The objections are, that the affidavits for attachment do not state that the plaintiff's claim is just; that the sheriff's returns on the orders of attachment are not signed by him, and that neither return states in so many words that the sheriff left a copy of the order with any occupant of the land attached, or in any conspicuous place thereon. The code (§ 191) requires that the affidavit for attachment shall *show*—not that it shall *state*—that the plaintiff's claim is just. A mere statement that it is just, is doubtless sufficient; but if there be no such statement, and the facts as stated in the affidavit show that the claim is just, that is also sufficient. Now in one case the affidavit alleges that the plaintiff's claim is "for the amount of money he was compelled to pay for and on account of a judgment rendered against the plaintiff on a bond or writing obligatory, wherein the said defendant was principal, and the said plaintiff was security, and which said plaintiff did pay for the benefit of said defendant; that the sum so paid, and for which defendant is indebted to him, amounts," etc. Now these facts thus sworn to clearly show a just and valid claim. That is all that the statute requires. (*Ludlow v. Ramsey*, 11 Wall. 581.) As to the other matters, the return and appraisement were fastened to the order of attachment, and thus as one instrument returned to the clerk's

53—28 KAS.

office.  The appraisement is signed by the sheriff as well as
the appraisers.  The return states that the officer attaches
the property as the property of the defendant, by declaring
on the premises that he attached the property at the suit of
the plaintiff named, and by taking the same into his posses-
sion and now holding it subject to the order of the court.
Then it states that he with two householders appraised, and
that the appraisement is attached and returned with this
order.  This return is not signed.  We think it ought to be.
A return to be complete requires the signature of the officer,
authenticating the statement of facts made in it.  The mere
fact that a paper is filed containing a recital of certain acts,
which paper is unsigned by anyone, contains no evidence
either that the acts so stated were in fact done, or if done, by
whom they were done.  Process in the nature of an order of
attachment must not only be executed in a certain way, but
also by a certain officer, and the signature of the officer is
essential to show both what was done and by whom it was
done.  This return in no manner discloses by whom the acts
stated in it were in fact done — whether by the sheriff, or the
plaintiff's attorney, or an entire stranger to the court or the
case.  Now without the signature of an officer, is it evidence
that anything was in fact done?  Counsel argue, that because
the statutes of some states explicitly require that the return
be signed by the officer, while ours does not, the failure to
attach such signature is an immaterial omission.  We cannot
concur with this argument, because we think the signature is
inherently an essential part of the return.  See the following
authorities as throwing some light on this question: *Burnett
v. Vinyard,* 34 Mo. 216; *Ditch v. Edwards,* 1 Scam. 127;
*Joyce v. Joyce,* 5 Cal. 449.  Nevertheless, the defect is one
which is amendable.  It is something which does not affect
the fact of service, but simply the evidence of it.  And gener-
ally amendments are permissible when they simply run to per-
fecting the proof of a service which was in fact made. (*Kirk-
wood v. Reedy,* 10 Kas. 453.)  But still the amendment is one
which should be made.  As the record stands, it fails to show

service. We may not presume that service was in fact made; the record should show it. The return may be amended, but until amended, we cannot presume that the facts were done and by the proper officer. As to the other defect, the failure to state in so many words that the officer left with the occupant, or if there were no occupant, in a conspicious place on the real estate, a copy of the order, the case of *Sharp v. Baird*, 43 Cal. 577, is an authority directly in point, and holding the defect fatal. Notwithstanding this authority and the great ability of the court by which it was pronounced, we are not prepared to yield full assent to it. The return states that the officer took possession of the property. The code, § 226, declares that "from the time of the issuing of the order of attachment, the court shall be deemed to have acquired jurisdiction, and to have control of all subsequent proceedings under the attachment." Now if the attachment was properly issued, and the officer in fact took possession of the property, we are inclined to think that the failure to leave with the occupant or on the place, a copy of the order, is a mere irregularity, and not a fatal defect. At any rate, if the officer did in fact so leave the order, the return may be so amended as to state the fact, and thus all question removed as to the regularity of the service.

III. The third question is by far the most difficult and embarrassing. If we are controlled by the face of the record, clearly the ruling of the district court was right. The assignee in bankruptcy takes only the property of the bankrupt which was his at the time of the filing of the petition in bankruptcy. The record shows a deed, executed in 1864, of the six-acre tract; this was before the commencement of the bankruptcy proceedings. The deed to the four-acre tract was not executed until April, 1869, and after the discharge in bankruptcy; so on the face of the record, this four-acre tract never belonged to the estate in bankruptcy. Counsel for plaintiffs in error contend that as the assignee scheduled this four-acre tract, as it was included in his petition for an order of sale, and also in the order of sale made by the bankrupt

court, and in fact sold and conveyed to Judd, that such proceedings operate as an adjudication by the bankrupt court, a court with full jurisdiction, and an adjudication conclusive upon the bankrupt and all claiming under him; that such tract did in fact belong to the bankrupt at the time of the filing of the petition in bankruptcy, and as such became a a part of the estate in bankruptcy. We do not so understand the scope and effect of bankruptcy proceedings. There was no distinct issue raised between the bankrupt and his assignee, and upon which the decision of the bankrupt court was asked and obtained, as to whether or not this tract was a part of the estate in bankruptcy. Perhaps if a controversy had arisen between them, and an issue been made and presented to the bankrupt court, its adjudication thereon might be final and conclusive. But the mere fact that the assignee of his own volition scheduled it, and upon his own application obtained an order for its sale, does not conclude the bankrupt. All that the order of the court determined is the fact of bankruptcy, the regularity of the proceedings, and that whatever title the bankrupt had at the time of filing the petition in bankruptcy has been transferred to the purchaser. There is no warranty of title in a sale by the assignee in bankruptcy, any more than in any other judicial sale. (*In re Goodfellow*, 1 Lowell, 510.) A sheriff levies upon real estate and sells it, and the sale is confirmed. This is not conclusive as to the title of the defendant in execution; neither is it conclusive that the real estate, if the property of the defendant, was not a homestead, and therefore exempt. All that is determined is, that whatever interest of the defendant in the real estate was subject to execution and sale, has been duly and properly sold. The purchaser takes his chance as to the title. *Caveat emptor* applies to such sales. Until the question of title or exemption is in some manner distinctly presented to the court for adjudication, it remains an open question — in no manner concluded by the fact of sale. Generally speaking, an order of a court to sell and a confirmation of a sale only settle questions as to the regularity of proceedings, and determine

no matters of title or exemptions. Counsel further argue, that as Traber, who instituted these attachment cases, was jointly interested with Norman in his claim against the bankrupt estate, he was estopped by those proceeding in the bankrupt court from thereafter saying that the four-acre tract was not a part of the bankrupt's estate. Clearly this claim is not tenable, and for several reasons: Norman in his petition to set aside the bankrupt's discharge, simply alleged that the six-acre tract was the property of the bankrupt, and he would not be estopped by the subsequent action of the assignee in bankruptcy in scheduling other property. He never asked that the four-acre tract be seized and sold as a part of the bankrupt's estate; and he certainly cannot be estopped by the voluntary and unsought action of an officer of the bankrupt court.

Further, although Norman instituted proceedings which resulted in the setting aside of the bankrupt's discharge, and in the sale of the real estate as the property of the bankrupt, yet long before the determination of those proceedings, Norman had sold his claim against the bankrupt's estate, and had no further interest in the result of those proceedings. Whatever was done in the bankrupt court after his sale of the claim, and which he had never in terms asked, in no manner wrought any estoppel upon him. But finally, it is claimed by counsel that equitably and in fact this four-acre tract belonged to the bankrupt's estate, and therefore that the purchaser under the bankrupt sale acquired a good title. A little further statement of facts is necessary to present clearly the basis of this claim. As heretofore stated, Snyder in 1860 became the owner of a title bond of ten acres. This bond stood in the name of Henry R. Seeger, his brother-in-law, so placed to keep the property out of the reach of Snyder's creditors. In 1864 Snyder received the *carte-blanche* deed, with authority to fill it up with a description of six acres on the banks of the Missouri river. This six acres, as testified to by Dr. Wood, was to be in fulfillment of the ten-acre title bond, change in location of the land being perhaps the basis

for the reduction in the quantity. After the partition heretofore referred to, and in 1868, the owners of the land partitioned made an arrangement with James F. Joy, representing the Hannibal & St. Joseph railroad company, by which, in consideration of the conveyance of a certain portion of land along the bank of the Missouri river, the latter was to rip-rap the bank so as to prevent any further washing of the land into the river. In pursuance of this contract, James made a deed of his entire Missouri river front to Joy. This deed, with similar deeds from other owners, was deposited in a bank in Kansas City, in escrow, to be delivered to Joy on the completion of the rip-rapping. While the deeds were thus in escrow, James went away to Michigan; and Snyder during his absence hearing of the arrangement with Joy, and that James was proposing to convey to him his entire river front, where by the prior arrangement with James he was entitled to locate his six acres, filled out his *carte-blanche* deed and had it recorded. The six acres therein described comprised part of the land which James by his deed in escrow was proposing to convey to Joy. On his return from Michigan, James, fearing that this act of Snyder's would complicate his transaction with Joy, persuaded him to deed back the six-acre tract, and in lieu thereof deeded to him the four-acre tract, a tract outside of the proposed conveyance to Joy. Now upon these facts, counsel argue that the four-acre tract was in fact the mere fulfillment of the ten-acre title bond; or as one counsel expresses it, it was the final partition between the owners of certain undivided interests, the final location by the parties interested of land which since 1860 equitably belonged to Snyder; that in all such transactions the courts will look beyond the mere form and letter of instruments to ascertain the substance and fact of the transaction. They further urge that the *carte-blanche* deed was void, and that the only legal conveyance in fulfillment of the title bond, the only one which in fact operated to vest title in Snyder, was the conveyance of the four-acre tract. This, as we have said, presents the most difficult and embarrassing question in the

case. We have spoken of these last matters as facts. They are testified to by Dr. Wood. They do not appear upon the face of the record, nor do they come to us from the immediate parties to these transactions, for both Snyder and James are dead. The testimony of Dr. Wood springs not from being a party to the transaction, but from information received through conversation with the parties, and from his familiarity with the dealings of the various parties interested in this reserve, in connection with their respective interests. Now we remark that *prima facie* the record controls; that where transactions are reduced to writing and placed upon record, the presumption is that those writings speak the truth. Parties dealing with the property have a right to act upon the presumed verity of those writings, and courts will deal with them as though they were true.

*Second:* As to the property, which is apparently after-acquired property, the burden is on the assignee and those claiming under him to show that it in fact and equitably belonged to the bankrupt at the time of filing his petition. (*Mays v. National Bank*, 64 Pa. St. 74.) No presumption arises from the fact that the assignee claimed and scheduled it, but the burden is on him to overthrow the evidence of the record.

*Third:* When the immediate parties to a transaction are dead, courts will be slow to disturb titles founded upon writings they have made and conveyances they have executed, upon the testimony of a mere outsider, for it is always a matter of doubt whether such outsider knows fully all the conditions and the circumstances of the dealings between the respective parties. They may have withheld a part of the facts from him; considerations may have existed, personal to the parties, of which they gave no information, and of which he may have been all the while entirely ignorant.

*Fourth:* While the *carte-blanche* deed may have been in the first instance, and when delivered by James to Snyder, of no validity as a deed, and while the act of Snyder in filling out the description and name of the grantee may also have been impotent to perfect the instrument as a conveyance of title to

the land described, yet it was possible for James, after the instrument had been formally completed, to ratify the act of Snyder, and thus to make in effect a subsequent delivery of a complete and perfect deed. (*Tucker v. Allen,* 16 Kas. 319.) There was evidence tending to show such ratification and re-delivery. Months after this deed had been placed on record, James sought and obtained a reconveyance of the land. Instead of challenging the instrument as void, he treated it as good, and obtained from the grantee in it a reconveyance of the title. Further than that, about two weeks after the conveyance of the four-acre tract, he obtained from the party in whose name the ten-acre title bond stood a release attested by Snyder, which release recites that it is made "in consideration of one dollar to me in hand paid, and the absolute fulfillment of the within bond by conveyance of six acres of land to Joseph E. Snyder, by deed dated July 27, 1864, and recorded," etc. This tends strongly to show that James ratified the act of Snyder, redelivered the deed, and treated it as a valid conveyance, although seeking by a new arrangement with him to avoid any disarrangement of his negotiations with Joy.

*Fifth:* The two deeds from James to Snyder are different, and differently conditioned. The deed of 1864 is a conveyance direct and absolute of the six acres, without limitations or conditions, and without covenants of warranty. The deed of 1869 is a conveyance of the four acres with warranty, but subject to the payment of a mortgage of $50 per acre, given to Silas Armstrong by James, and also subject to the payment of $125 due C. F. Welland, and also to unpaid taxes. This also tends to show a new dealing, with new considerations between the parties.

*Sixth:* By the bankruptcy proceedings, the title bond passed to the assignee, and Snyder had no right to locate it; nevertheless, when he did in fact act, the assignee might accept and ratify his actions. By scheduling the six acres, he did in effect accept and ratify it. It may be said that by scheduling the four acres he also accepted and ratified Snyder's

act in respect to that tract, but both tracts did not belong to Snyder as a part of his estate in bankruptcy. If the six-acre tract belonged to the estate in bankruptcy, the four-acre tract did not. Whatever consideration passed to James, and whatever inducement he received for making this four-acre conveyance, if the six acres belonged to the estate in bankruptcy, the four-acre tract did not, but was after-acquired property of Snyder. The assignee could not take both. By scheduling and selling the six acres· he ratified Snyder's action in that respect, and could not reach out and take more. Even if it was a purely voluntary conveyance from James to Snyder, it would still be after-acquired property.

*Seventh:* Not only did the assignee in bankruptcy schedule and sell the six acres — the purchaser from him also asserted his rights thereto, conveyed the whole land to Bartlett and Cobb, who, on August 15, 1872, sold that portion within the limits of the Joy conveyance to the railroad company for $850. Not only did they thus assert a right to the six-acre tract and receive the benefit which flowed from ownership, but they also practically abandoned all claim to the land in controversy, and conceded that they had no title to it. They sought to obtain tax titles on the land in controversy, and out of this effort resulted their subsequent quitclaim to McAlpine. They purchased at the tax sale with their own money, but in the name of a friend, and caused subsequent taxes to be paid upon the same certificate. By a mistake of McAlpine, then the county treasurer, the payment of these subsequent taxes was not credited to them on the sale book, and so when Traber redeemed the land he obtained the certificate of redemption without the payment of the last year's taxes. When they came for their redemption-money, they consequently found in the treasury only a part of the amount due them. After some negotiations, McAlpine agreed to pay the balance due, providing they would execute a quitclaim to him. Thus McAlpine acquired his interest. In other words, he in fact paid nothing for the land, but obtained a quitclaim by making good the loss occasioned by his

own omission of duty; a loss for which he would be either directly or indirectly responsible to the grantors in the quit-claim. Putting all these things together, we think the district court rightly held against the bankrupt-proceedings title. The face of the record is against it. The parties in interest on each side all finally rejected it, and now to permit a mere speculator, paying nothing, but simply making good a loss occasioned by his omission of official duty, to come in and appropriate valuable land which all the real parties in interest conceded to belong to the plaintiffs, would, we think, be rank injustice.

IV. The remaining question is of little difficulty. The defendants offered in evidence two tax deeds. The description in one deed is as follows: "Five acres out of the following described tract, viz.," (here deed described thirty-eight acres by metes and bounds, being the entire James tract,) "five acres; said land assessed in name of and as belonging to Jos. E. Snyder, excepting two acres off the easterly end, said land fronting on the Missouri river, redeemed February 8, 1873, by H. & St. J. R. R. Co." This deed was based on the taxes of 1868. The assessment roll describes only the thirty-eight-acre tract belonging to James, and describes it by metes and bounds. The notice of sale follows the assessment roll. The sale certificate simply says five acres out of the thirty-eight-acre tract, without giving by ownership or otherwise any further description. The deed as above copied, attempts to perfect the description by reciting that the land was assessed in the name of and as belonging to Jos. E. Snyder. But there was no land assessed in the name of Snyder, and at the time of the making of the tax roll, the six-acre conveyance had not been filled out and recorded; so that there was in fact at that time not the slightest pretense of any location of Snyder's interest in the land. Furthermore, the four-acre conveyance was not made until April, 1869. But beyond all this, it is impossible to ascertain what land was included within these five acres. Snyder's two deeds called for six acres and four acres respectively. Neither of them

described a five-acre tract, and only by mere guessing could it be determined that the land in controversy was intended to be embraced within the description in this tax deed. But tax titles never rest on guesses. Tax collections are proceedings *in invitum*, and must describe the land so that "with ordinary and reasonable certainty it can" be determined exactly what land has been seized and sold. (Comp. Laws 1879, ch. 107, §153.) The other deed is for the taxes of 1869. The description is as follows: "Commencing at the N. W. corner of tract conveyed to J. F. Joy by D. E. James, S. 28° 10', E. 300 feet, S. 62° 10', 580 feet, N. 28° 10', W. 300 feet, N. 62° 10'; E. 580 feet, to beginning. Four acres same land assessed in name of and as belonging to Jos. E. Snyder, excepting two acres off the easterly end fronting on the Missouri river, redeemed February 8, 1873, by the H. & St. Jo. R. R. Co."

There is in this description the same question as in the four-acre conveyance to Snyder, as to what was intended by the "northwest corner," etc. If the initial point in that conveyance was technically and correctly the southwest corner of the railroad land, then the northwest corner was on the river; and that this is the corner intended in this tax deed, is strengthened by the recital of a redemption by the railroad company of two acres on the river front. But again, conceding that the description in the deed is sufficient to cover the land in controversy, so that the deed on its face is good, still the title was challenged within a few months after the record of the deed, and defects were shown in the prior proceedings. The sale book, the notice of sale, and the sale certificate, are all defective in omitting these words from the description: "W. 300 ft., N. 62° 10'"—which leaves a description obviously imperfect and incomplete. Hence, the title attempted to be conveyed by the tax deed must fail. See the following authorities, upon defects in the description of tax deeds: *Orton v. Noonan*, 23 Wis. 102; *Winker v. Higgins*, 9 Ohio, 500; *Larrabee v. Hodgkins*, 58 Me. 412; *Griffin*

*v. Creppin*, 60 Me. 270; *Bingham v. Smith*, 63 Me. 450; *Onkendorf v. Taylor*, 4 Pet. 349.

This disposes of all the vital questions in the case. We see nothing in the minor matters requiring comment. For the reasons indicated while discussing the regularity of the attachment proceedings, the judgment in favor of the plaintiffs upon the record as it stands, was improper. Nevertheless, as the case seems to have been fully tried, and all available testimony introduced, it would seem unnecessary and wrong to simply reverse the judgment and remand the case for a new trial; providing, of course, that the facts as they existed will permit an amendment of the sheriff's returns upon the attachment orders. It is perhaps a novel way of disposing of the case, but we think substantial justice requires the order which will be made, which is that the case be remanded to the district court with the instructions that if within such reasonable time as the district court or judge shall prescribe, the sheriff's returns on the attachment orders shall be amended in conformity to the views expressed by this court in this opinion, the judgment shall be affirmed. On the other hand, if such amendment cannot be obtained, the judgment will be reversed, and the case remanded for a new trial.

All the Justices concurring.